**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 2:19-cv-05055-KSM** |
| **LAW OFFICES OF RICHARD C. WEISBERG, et al.,** | |
| Defendants. | |

**MEMORANDUM**

**MARSTON, J.**                                                    **MARCH 9, 2021**

Defendant Richard Weisberg; his mother, Mildred Weisberg; and his brother, James Weisberg have brought four lawsuits against each other in state and federal court.  In this action, Richard's legal malpractice insurance carrier, Plaintiff American Guarantee and Liability Insurance Company, seeks a declaratory judgment that it is not required to defend or indemnify Richard Weisberg or his law firm, Defendant the Law Offices of Richard C. Weisberg, (collectively, "Weisberg" or "Richard") in the underlying actions with his family.  Before us are the parties' cross-motions for summary judgment.  For the reasons discussed below, we grant American Guarantee's motion in part and deny the remainder of the motion as moot.  We deny Weisberg's motion in its entirety.

## I.      *Factual Background*

Richard worked as a solo practitioner from 1999 to 2017 under the business name the Law Offices of Richard C. Weisberg.  (Doc. No. 57-1 at p. 4.)  Although Richard handled matters in Canada and across the United States, including in California and Washington, D.C., he

lived in Pennsylvania and used his home address as his business address.  (*Id.*)  In August 2016, in preparation for his retirement, Richard sold his home in Bala Cynwyd, Pennsylvania, and began looking for a new residence in Arizona.  (*Id.* at p. 2.)  One year later, in August 2017, Richard signed a lease on a condo in Carefree, Arizona, and he has resided in Arizona since then. (*Id.*)  A few months later, on December 31, 2017, Richard officially retired from the practice of law.  (*Id.* at p. 3.)

###### A.      The Insurance Policy

In his final year of practice, Richard was covered by a Lawyers Professional Liability Insurance Policy (the "Policy") issued by American Guarantee.  (Doc. No. 42-2 at ¶ 1; Doc. No. 50 at ¶ 1; *see also* Doc. No. 42-3 at pp. 3–29.)  Weisberg applied for the policy in December 2016, sending an application to his Texas insurance broker, who submitted it to American Guarantee.  (Doc. No. 58-1 at pp. 4, 7.)  At that point, Weisberg had sold his Bala Cynwyd home, so in his email to the broker, Weisberg included a note that said "*** NOTE NEW ADDRESS ***" and listed an address in Merion Station, Pennsylvania.  (*Id.*)  He also included a copy of his business letterhead, which listed the Merion Station address.  (*Id.* at p. 8.)  American Guarantee accepted Weisberg's renewal application and issued the policy, which ran from January 14, 2017 to January 14, 2018.  The policy identifies the "Law Offices of Richard C. Weisberg" as the "Named Insured" and lists the law firm's mailing address as Merion Station. (Doc. No. 42-3 at p. 5.)

###### 1.      The Notice Provisions

The policy is a claims-made policy,[1] stating that American Guarantee will "pay on behalf of an Insured . . . all amounts in excess of the Deductible set forth in the Declarations that an

---

[1] A claims-made policy is one which provides "coverage for claims made during the policy period, regardless of when the incidents that gave rise to the claim occurred."  *Prime Ins. Syndicate v.*

Insured becomes legally obligated to pay as Damages because of a Claim that is ***both first made and reported to the Company during the Policy Period or any Extended Reporting Period***, if applicable, based on an act or omission in the Insured's rendering or failing to render Legal Services for others" (the "Coverage Provision").  (Doc. No. 42-3 at p. 9 (emphasis added).)  In January 2017, while visiting California, Richard completed an Order to Purchase Non-Practicing Extended Reporting Period Endorsement.  (Doc. No. 57-1 at p. 3.)  He sent the order to his broker, who submitted it to American Guarantee, and in December 2017, American Guarantee issued to Richard an unlimited Extended Reporting Period Elected Endorsement (the "ERP Endorsement").  (Doc. No. 42-2 at ¶ 3; Doc. No. 57-1 at p. 4.)  Although he lived in Arizona at the time, the ERP Endorsement was addressed to Weisberg in Merion Station.  (Doc. No. 57-1 at pp. 4, 20, 22.)

 In addition to requiring that Weisberg provide notice of claims during the policy period or extended reporting period, the policy also states that as "a condition precedent to coverage" Weisberg must "immediately provide Notice to the Company of any Claim made against an Insured" and "immediately forward to the Company every demand, notice, summons, or other process received directly or by any Insured's representative" (the "Prompt-Notice Provision"). (Doc. No. 42-3 at p. 16.)

---

*Ass'n of Prop. Owners of Hideout, Inc.*, No. 3:05CV1692, 2006 WL 3759735, at *6 n.1 (M.D. Pa. Dec. 19, 2006); *see also Pizzini v. Am. Int'l Specialty Lines Ins. Co.*, 210 F. Supp. 2d 658, 668 (E.D. Pa. 2002) ("'Claims made [policies] protect[ ] against claims made during the life of a policy irrespective of when the act giving rise to the claim occurred.").  An occurrence-based policy, by contrast, offers "coverage of incidents that occur during the period covered by the policy, even if the claim related to that incident is filed after the policy period ends." *Prime Ins. Syndicate*, 2006 WL 3759735, at *6  n.1; *see also Westport Ins. Co. v. Mirsky*, No. CIV.A. 00-4367, 2002 WL 31018554, at *10 (E.D. Pa. Sept. 10, 2002) ("'Claims made' policies are different from 'occurrence' polices, which protect an insured against occurrences during a policy period, regardless of when the resulting claims are made.").

### 2.   *Covered Claims*

The Policy gives American Guarantee "the right and duty to defend any Claim based on an act or omission in the Insured's rendering or failing to render Legal Services for others, seeking Damages that are covered by this Policy."  (Doc. No. 42-3 at p. 9.)  "Claim" is defined as "a demand for money or Legal Services and alleging liability or responsibility of any Insured."  (*Id.* at p. 9.)  "Legal Services," in turn, is defined as "professional services performed by an Insured as a licensed lawyer in good standing . . . or in any other fiduciary capacity but only where the act or omission was in the rendition of services ordinarily performed as a lawyer."  (*Id.* at p. 21.)  In relevant part, the policy defines "Damages" as "the monetary and compensatory portion of any judgment, award or settlement."  (*Id.* at p. 45.)  By definition, "Damages do not include:" (1) "personal profit or advantage to which any Insured was not legally entitled," (2) punitive damages, or (3) "[a]ny form of equitable or non-monetary relief."  (*Id.*)

### 3.   *Exclusions*

The policy also includes multiple exclusions from coverage, three of which are relevant here.  First, under Exclusion D, the policy does "not apply to any Claim [or] Damages . . . arising out of, in whole or in part . . . an Insured's or former Insured's capacity or status as . . . an officer, director, partner, shareholder, manager or employee of a business organization . . . ."  (*Id.* at p. 11.)  Under Exclusion G, the policy does not apply to "any Claim [or] Damages . . . arising out of, in whole or in part . . . [a]ny liability of any Insured resulting from any oral or written contract or agreement, including an attorney retainer agreement which provides for prevailing party fees, unless such liability would have attached to the Insured by law in the absence of such contract or agreement."  (*Id.*)  Last, Exclusion T states that the policy does not apply to "any

Claim [or] Damages . . . arising out of in whole or in part . . . [a]ny actual or alleged acts or omissions by any Insured . . . in connection with any investment in why any Insured has an interest."[2]  (*Id.* at p. 12.)

With those provisions in mind, we turn to the underlying actions asserted by Mildred and/or James against Richard.

### B.    *The Underlying Actions*

#### 1.    *Background*

To understand the four underlying actions, a brief description of the Weisberg family is helpful.  Mildred and Morris Weisberg met in law school at the University of Pennsylvania, married, and raised three sons — Richard, James, and John.  (Doc. No. 42-3 at pp. 35–36.)  As among the three sons, Richard followed in his parents' footsteps and became an attorney after graduating from Yale Law School, while James began a career in business after graduating from Harvard Business School.  (Doc. No. 42-4 at p. 5.)  The third brother, John, suffers from schizophrenia, and all parties agree that he needs, and will continue to need, supplemental care. (Doc. No. 42-3 at p. 36.)

---

[2] Although we do not address them in this opinion, American Guarantee also relies on Exclusions E and U.  Exclusion E states that the policy does not apply to "any Claim [or] Damages . . . arising out of, in whole or in part . . . [t]he alleged acts or omissions by any Insured . . . in connection with any business enterprise (other than the Named Insured), whether for profit or not for profit, in which any insured has a Controlling Interest."  (Doc. No. 42-3 at p. 11.)  An Insured has a "Controlling Interest" in a business enterprise, if either the "Insured or a member of an Insured's Immediate Family" has the right to: "[1]  Own 10% or more of an interest in an entity; . . . or [2] Act as a general partner of a limited partnership, managing general partner of a general partnership, or comparable position in any other business enterprise."  (*Id.* at pp. 19–20.)  Because the policy defines an insured's "Immediate Family" as including the "Insured's parent(s)" and the "Insured's siblings," both Mildred and James are Richard's "Immediate Family" for purposes of the policy.  (*See id.* at p. 20.)  Last, under Exclusion U, the policy does not apply to "any Claim [or] Damages . . . arising out of in whole or in part . . . [t]he gaining by any Insured of any personal profit, gain or advantage to which such Insured was not legally entitled."  (*Id.* at p. 12.)

On April 7, 2014, Morris Weisberg died, and the seeds of discord within his family began to take root.  By 2016, "the family relationship as between Mildred and James, on the one hand, and Richard, on the other, rapidly deteriorated and became unrepairable."  (*Id.* at p. 42; *see also id.* at p. 93 ("The family relationship between Mildred and her eldest son Richard, the Plaintiff, is broken and had been severely ruptured before the existence of the Document.").)  The four lawsuits reflect the tragic state of the Weisberg family relationship.

### 2. Lawsuit I:  The Testamentary Trust Action

On August 17, 2018, Mildred — in her capacity as Executrix under the Will of her deceased husband, Morris L. Weisberg — and James — in his capacity as co-trustee of his brother, John Weisberg's Discretionary Supplemental Care Trust (the "Testamentary Trust") — filed a petition to show cause against Richard in the Montgomery County Court of Common Pleas.  (*See generally* Doc. No. 42-3 at pp. 34–48.)  In their petition, Mildred and James allege that Morris's Will calls for the creation of the Testamentary Trust, which is to be funded with $200,000 from the estate.  (*Id.* at p. 37.)  Under the terms of the Will, James and Richard are to be co-trustees of the Testamentary Trust, and John, the beneficiary.  (*Id.*)  Unanimous written consent is required before any fiduciary can withdraw funds from the trust account.  (*Id.*)

Mildred, believing that Richard had formally established the Testamentary Trust, directed James to transfer $200,000 from her account for Richard to deposit into the trust account. (*Id.* at p. 38.)  But unbeknownst to Mildred, Richard had not actually created the Testamentary Trust, and instead, placed the money in a separate trust that he created for the benefit of John before Morris died (the "Inter Vivos Trust").  As of August 2018, Richard had not returned the $200,000 or placed it in the Testamentary Trust account, and Mildred and James filed suit against Richard, alleging that he breached his fiduciary duties, that he "violated his duties as a

Co-Trustee under the Testamentary Trust" and that by his conduct, Richard may also have

"breached the qualification to be barred as an attorney" in Pennsylvania, committed theft, and/or

committed fraud.  (*Id.* at pp. 36, 39–41.)  Among other things, Mildred and James asked the

court to direct the transfer of $200,000 from the Inter Vivos Trust to the Testamentary Trust and

to remove Richard as co-trustee of the Testamentary Trust.  (*Id.* at p. 34.)

### 3.     *Lawsuit II:  The Investment Account Counterclaim*[3]

Richard then filed two separate actions against James, also in the Montgomery County

Court of Common Pleas, and on December 18, 2018, James filed an answer and counterclaim in

one of those actions.  This counterclaim relates to a document that purports to be an agreement

between Mildred, James, and Richard and that directs the parties to take certain actions with

respect to investment accounts held by Mildred.  (*Id.* at p. 99.)  James alleges that the document

is not a valid contract and that Richard "as an attorney and partner in national law firms, preyed

upon his mother's desire to not rupture family relationships in extracting the Document from her

and James."  (*Id.*)  James also argues:

> The nature of this suit, brought by a licensed attorney, oldest son, suing upon a
> Document given out of love and affection, procured by him through threat and
> duress against his then 91 year old mother and brother, upon a subject matter over
> which he has no legal or equitable interest, is outrageous, frivolous, vexatious, and
> brought in bad faith, only to harass his mother in her twilight years, warrants the
> imposition of attorney fees, costs, expenses and such other relief the Court deems
> just.

(*Id.* at p. 106.)  James seeks a declaratory judgment that the document is "null, void, and

of no effect and/or not an enforceable contract and/or that no repudiation or other breach

has occurred and/or the claims made in the Compliant are not ripe for determination."

(*Id.* at p. 105.)

---

[3] This case has since been voluntarily dismissed.  (Doc. No. 70, Oral Ar. Tr. at 41:21–24.)

In addition to his counterclaim, James also filed an answer that responds to each factual averment asserted by Richard in his complaint.  In the answer, James denies many of the factual averments and states that to the extent they are "based on information James confided in Plaintiff when, allegedly, [Richard] counseled with [James] concerning [James's] bankruptcy, the averments amount to an inexcusable breach of attorney-client confidentiality in a public filing." (*See, e.g.*, *id.* at p. 84.)  In addition, James lists as a "further defense" the fact that Richard's "conduct amounts to a breach of trust as an attorney, eldest son, person, and limited agent." (*Id.* at p. 101.)  However, James does not discuss these issues in his counterclaim, nor does he assert a counterclaim for the alleged breaches.

### 4.   *Lawsuit III:  The Real Estate Partnership Counterclaim*

Richard's second complaint and James's second counterclaim involves two real estate ventures.  According to James, he and Richard entered into "two oral partnership agreements respecting the purchase, capital, return, ownership, renovation, investment, and ultimate sale" of two properties, one located at 67 Holland Avenue (the "Holland Property") and one located at 115 Walnut Avenue (the "Walnut Property").  (*Id.* at p. 55.)  James claims that Richard unilaterally sold both properties and kept all profits in violation of the oral partnership agreements and in breach of his fiduciary duties to the respective partnerships and partners.  (*Id.* at pp. 62–65.)  James also notes that Richard "served as counsel for the partnership," and that James signed certain documents out of respect for Richard's role as counsel and his older brother.  (*Id.* at p. 61.)  In his counterclaim, James claims, among other things, that Richard breached the partnership agreements, breached the statutory duties "owed by one partner to another," and breached the fiduciary duties owed by one partner to another.  (*Id.* at pp. 68–80.)

### 5.      *Lawsuit IV:  The Cricket Property Action*

The final lawsuit is pending before this Court.  On July 3, 2019, Mildred, acting in her individual capacity and as Executrix of Morris's Estate, filed suit against Richard.  (*See* Doc. No. 42-4 at p. 22.)  She alleges that in 2012, she and Morris entered an agreement with Richard, under which Richard would purchase the property located at 149 Cricket Avenue (the "Cricket Property") and hold title "on behalf of Morris and Mildred and as their agent, initially, but at all times for the benefit of John."  (*Id.* at p. 6.)  In exchange, Mildred and Morris agreed to reimburse Richard for expenses related to the purchase, renovation, and maintenance of the property.  (*Id.*)  Mildred alleges that in total she and Morris paid Richard more than $290,000 as reimbursement for mortgage payments, property taxes, costs of renovations, and other expenses related to the property.  (*Id.* at p. 10.)  After Morris died, Richard allegedly threatened to sell the property in violation of the agreement with his parents, forcing Mildred to purchase the property from him at full price.  (*Id.* at pp. 11–13.)

During this time Mildred also loaned Richard a little over $10,000 for renovations on his primary residence at 33 Derwen Lane in Bala Cynwyd (the "Derwen Property"); however, when Richard sold the home in August 2016, he refused to pay back the loan.  (*Id.* at p. 11.)  Mildred alleges that Richard's actions amount to (1) breach of the oral agreement related to the Cricket Property; (2) promissory estoppel; (3) unjust enrichment/constructive trust related to the $290,957.46 that Mildred and Morris initially paid Richard; (4) resulting trust; (5) conversion; (6) money had and received; (7) breach of fiduciary duties that Richard owed his parents as their "agent"; (8) equitable accounting based on the "fiduciary relationship" between Richard and his parents; (9) breach of contract as to the Derwen Property loan; and (10) unjust enrichment/constructive trust as to the Derwen Property loan.  (*Id.* at pp. 11–23.)

### C.    *Richard Notifies American Guarantee of the Underlying Claims*

On May 11, 2019, Richard notified American Guarantee of the Testamentary Trust

Action, the Investment Account Counterclaim, and the Real Estate Partnership Counterclaim.

(Doc. No. 42-2 at ¶ 29; Doc. No. 42-4 at p. 56; Doc. No. 49 at p. 4.)  The notice letter was sent

from his address in Arizona to American Guarantee's Professional Liability Claims Department

in Illinois.  (Doc. No. 42-4 at p. 56.)  In the letter, Weisberg asserts that the three actions

constitute related claims and that all are covered by the policy.  (*Id.*)

On July 25, 2019, while American Guarantee was investigating whether Weisberg was

entitled to coverage for the first three lawsuits, the company sent Weisberg a letter

acknowledging receipt of the complaint in the fourth lawsuit, the Cricket Property Action, and

denying coverage as to that suit.  (Doc. No. 42-5 at pp. 1,4.)  After much back and forth between

Weisberg's counsel and counsel for American Guarantee, American Guarantee sent a second

letter to Weisberg on October 29, 2019, explaining its full coverage position, and denying

coverage for all four lawsuits.  (Doc. No. 42-6 at pp. 12, 18–23.)

## II.    *Procedural History*

On October 28, 2019 — the day before American Guarantee sent its second letter — the

company filed its complaint in this action, requesting a declaratory judgment that it has no

obligation to defend or indemnify Weisberg in the underlying suits.[4]  (Doc. No. 1 at p. 2.)  The

complaint contains eleven counts, each seeking a different declaration that it is not obligated to

defend or indemnify Weisberg under the policy.  (*See* Doc. No. 1 at pp. 10–11 (Count I:

---

[4] One week after American Guarantee filed its complaint in this Court, Weisberg filed a
complaint against American Guarantee in the District of Arizona, bringing counts for breach of contract
and bad faith denial of coverage.  (Doc. No. 42-6 at p. 28.)  The Arizona Court dismissed that action in
September 2020 after finding that Mildred and James are necessary and indispensable parties whose
joinder was not feasible.  (*Id.* at p. 30.)  None of the parties have moved to join Mildred and James in this
action, nor have they argued that their joinder is necessary.

Testamentary Trust Action); *id.* at pp. 11–14 (Counts II and III:  Investment Account

Counterclaim; *id.* at pp. 14–20 (Counts IV through VIII:  Real Estate Partnership Counterclaim);

*id.* at pp. 20–24 (Counts IX through XI: Cricket Property Action).)  With his answer, Weisberg

asserts counterclaims for breach of contract and breach of the duty of good faith and fair dealing.

(Doc. No. 27.)

At the end of discovery, both parties moved for summary judgment on all counts.  (*See*

Doc. Nos. 42 & 44.)  The Court then requested supplemental briefing from the parties on

whether Pennsylvania or Arizona law governs this dispute.  (Doc. No. 56.)  And after reviewing

the parties' supplemental briefs (Doc. Nos. 57–58), the Court held oral argument on March 2,

2021 on the choice of law issue.

### III.    Standard of Review

Summary judgment is appropriate when the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c).  "[A]t the summary judgment stage the judge's function is not

himself to weigh the evidence and determine the truth of the matter but to determine whether

there is a genuine issue for trial."  *Id.* at 249.  And at "summary judgment the inferences to be

drawn from the underlying facts must be viewed in the light most favorable to the party opposing

the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

(quotation marks and alterations omitted).  "The same standards and burdens apply on cross-

motions for summary judgment."  *United States v. Weiss*, 461 F. Supp. 3d 183, 187 (E.D. Pa.

2020) (quoting *Allah v. Ricci*, 532 F. App'x 48 (3d Cir. 2013)).  "If review of the cross-motions

reveals no genuine issue of material fact, then judgment may be entered in favor of the party

deserving of judgment in light of the law and undisputed facts." *Id.* (alterations adopted and quotation marks omitted).

## IV.    *Choice of Law*

In his initial briefing, Weisberg stated in a footnote that "[a]lthough the parties dispute whether Arizona or Pennsylvania law applies to this action, both jurisdictions require the same outcome here and there is no conflict."  (Doc. No. 42-1 at p. 14 n.1.)  In his supplemental brief, Weisberg argues that the relevant states are Arizona, Pennsylvania, and Texas, but maintains that there is no actual conflict of laws.  (*See* Doc. No. 57 at pp. 4, 6–8.)  To the extent we find there is a conflict, Weisberg champions Texas law as controlling.  (*Id.* at pp. 8–11.)  By contrast, American Guarantee argues that Pennsylvania law controls, but in the alternative Texas and Illinois have a greater interest in this dispute than Arizona.[5]  (*See generally* Doc. No. 58; Doc. No. 62 at pp. 13–14; Doc. No. 70, Oral Ar. Tr. at 18.)

### A.    *Legal Standard*

Because this is a diversity case, we apply the choice of law rules of the forum state, Pennsylvania.  *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 171 (3d Cir. 2011) ("In an action based on diversity of citizenship, a federal court generally applies the choice-of-law rules of the jurisdiction in which it sits.").  "Pennsylvania applies a 'flexible rule which permits analysis of the policies and interests underlying the particular issue before the court' and directs courts to apply the law of the state with the 'most interest in the problem.'"  *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d 223, 229 (3d Cir. 2010) (quoting *Hammersmith v. TIG Ins. Co.*, 480

---

[5] Although both parties have referenced Illinois, neither party has advocated for its application in this case.  Therefore, we limit our discussion to whether Arizona, Pennsylvania, or Texas law applies. (*See* Doc. No. 58 at p. 11 ("Illinois law has not been considered in the [choice of law] analysis."); *see also* Doc. No. 70, Oral Ar. Tr. at 17:16–18:25 (acknowledging that Illinois has some contact with the parties' contract but continuing to advocate for application of Pennsylvania law).)

F.3d 220, 227 (3d Cir. 2007)); *see also Hammersmith*, 480 F.3d at 226–27 ("[W]e think it is now clear that Pennsylvania applies the more flexible, 'interest/contacts' methodology to contract choice-of-law questions.").

The Third Circuit has described this choice of law analysis as containing three steps. First, we must determine whether there is an actual conflict between the laws of the relevant states. *See Hammersmith*, 480 F.3d at 230 ("[T]he first part of the choice of law inquiry is best understood as determining if there is an actual or real conflict between the potentially applicable laws."). "If two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary." *See id.*; *see also Budtel Assoc., L.P. v. Cont'l Cas. Co.*, 915 A.2d 640, 641 (Pa. Super. Ct. 2006) ("[T]he first step in a choice of law analysis under Pennsylvania law is to determine whether a conflict exists between the laws of the competing states. If no conflict exists, further analysis is unnecessary. If a conflict is found, it must be determined which state has the greater interest in the application of its law.").

If, however, the laws of the states differ, then the court moves on to the second step of the inquiry and "examine[s] the governmental policies underlying each law . . . classify[ing] the conflict as a 'true,' 'false,' or an 'unprovided-for' situation." *See Hammersmith*, 480 F.3d at 230. If, on the facts of the case, every jurisdiction's interests would be impaired by the application of a different jurisdiction's laws, there is a "true conflict" and under the third step in the inquiry, the court must "determine which state has the 'greater interest in the application of its laws.'" *Id.* at 231. If, however, "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's laws," there is a false conflict, and "we

apply the law of the only interested jurisdiction."[6]  *Garcia v. Plaza Oldsmobile Ltd.*, 421 F.3d 216, 220 (3d Cir. 2005).

If there is a true conflict, the court moves to the third step and "weigh[s] the contacts [of each state] on a qualitative scale according to their relation to the policies and interests underlying the [particular] issue."  *See Hammersmith*, 480 F.3d at 231 (quotation marks omitted). We begin this analysis with § 193 of the Restatement (Second) of Conflicts of Laws, "bearing in mind that we are concerned with the contract of insurance and not the underlying tort."  *Id.* at 232–33 (quotation marks omitted).  Section 193 "governs casualty insurance contracts, and provides that the 'validity of the contract and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless some other state has a more significant relationship to the transaction and the parties.'"  *Id.* at 233 (quoting Restatement (Second) of Conflict of Laws § 193) (alterations adopted).  However, when there is no one state that serves as the "principal location of the insured risk," section 193 "is largely inapplicable" and we must "turn to § 188(2) (the general provision governing contracts)."  *Id.*  Section 188(2) directs us to take the following contacts into account:  "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties."  *Id.*

### B.    Analysis

The only potential conflict of laws relates to late notice.  American Guarantee refused to defend or indemnify Weisberg in the Testamentary Trust Action because he did not

---

[6] An unprovided for case is one "in which neither jurisdiction's interests would be impaired if its laws are not applied."  *Garcia*, 421 F.3d at 220.

"immediately" give notice as required by the policy's prompt-notice provision. (Doc. No. 42-6 at p. 18.) Weisberg argues that American Guarantee is required to show that it was prejudiced by Weisberg's allegedly late notice before it can refuse to defend. (*See, e.g.*, Doc. No. 42-1 at pp. 18–20.) American Guarantee argues that it is not. (*See, e.g.*, Doc. No. 44 at p. 107.) The answer to their dispute depends on which state's laws we apply to this dispute.

### 1. *Actual Conflict*

First, we must determine whether there is an "actual" conflict between the state laws. Weisberg asserts that there is no actual conflict between Arizona, Pennsylvania, and Texas on the issue of late notice because all three states require a showing of prejudice before an insurer can deny coverage on the basis of late notice. Although American Guarantee chose not to analyze whether there is an actual conflict, the insurance company does dispute Weisberg's characterization of Pennsylvania law. It argues that Pennsylvania law does ***not*** require a showing of prejudice when the notice provision appears in claims-made policies like the one at issue here. Therefore, we must first clarify the law of Pennsylvania on this issue. From there the Court will analyze whether Pennsylvania law is different from that of Arizona and/or Texas.

### i. *Pennsylvania Law*

The parties' disagreement is based on their differing interpretations of the Pennsylvania Supreme Court's ruling in *Brakeman v. Potomac Insurance Co.* and its progeny. (*See* Doc. No. 42-1 at pp. 18–20; Doc. No. 44 at pp. 106–07; Doc. No. 48 at pp. 5–6; Doc. No. 49 at pp. 8–9; Doc. No. 51 at p. 5.) In *Brakeman*, the plaintiff was severely injured when his motorcycle collided with a car insured by the defendant insurance company. 371 A.2d 193, 194 (Pa. 1977). The motorcycle driver sued the driver of the car, and the driver of the car sent written notice of the suit to his insurance company. *Id.* The insurer refused to defend the driver of the car in the

underlying suit, because he "breached the insurance contract by failing to provide [the insurer] with timely notice of the accident." *Id.* In a later action against the insurance company, the trial court agreed and found that the insured's notice seven months after the accident was unreasonable and violated the insurance policy which stated: "In the event of an accident, occurrence or loss, written notice . . . [s]hall be given by or for the insured to the company or any of its authorized agents ***as soon as practicable.***" *Id.* at 194–95.

On appeal, the Pennsylvania Supreme Court concluded that the "preferable rule is that which requires the insurance company to prove not only that the notice provision was breached, but also that it suffered prejudice as a consequence." *Id.* at 195, 198. This is often referred to as the "notice-prejudice rule." The *Brakeman* court explained its rationale as being based in part on the limited bargaining power of the insured: "The only aspect of the contract over which the insured can 'bargain' is the monetary amount of coverage." *Id.* at 196. It also noted that insurance contracts often contain identical notice provisions, and "[t]hus, an insured is not able to choose among a variety of insurance policies materially different with respect to notice requirements, and a proper analysis requires this reality be taken into account." *Id.* Next, the court found that a "strict contractual approach" was "inappropriate" because it would frequently result in "forfeiture," and the court was "reluctant" to "allow an insurance company to refuse to provide that which it was paid for unless a sound reason exists for doing so." *Id.* Last, the court acknowledged that the "function of a notice requirement is to protect the insurance company's interests from being prejudiced." *Id.* "Where the insurance company's interests have not been harmed by a late notice, even in the absence of extenuating circumstances to excuse the tardiness, the reason behind the notice condition in the policy is lacking, and it follows neither

logic nor fairness to relieve the insurance company of its obligations under the policy in such a situation." *Id.* at 197.

Despite the broad references to "liability insurance policies" throughout *Brakeman*, many federal district courts in this Circuit have limited *Brakeman*'s holding to occurrence-based policies and refused to extend the notice-prejudice rule to claims-made policies. *See, e.g.*, *City of Harrisburg v. Int'l Surplus Lines Co.*, 596 F. Supp. 954, 960 (M.D. Pa. 1984); *Westport Ins. Corp.*, 2002 WL 31018554, at *10; *Pizzini*, 210 F. Supp. 2d at 667–70; *Borish v. Britamco Underwriters, Inc.*, 869 F. Supp. 316, 319 (E.D. Pa. 1994). Attempting to distinguish these cases, Weisberg argues that the reasoning described in *Brakeman* applies to all prompt notice provisions regardless of whether they are in an occurrence-based policy or a claims-made policy. (*See, e.g.*, Doc. No. 57 at pp. 6–7.) But at least three federal cases and one Pennsylvania case hold otherwise. *See 4th Street LLC v. Dowdell*, 340 F. App'x 99, 100 (3d Cir. 2009) (citing *City of Harrisburg* and *Pizzini* and finding that the insurance company was not required to show prejudice where the insured violated a prompt notice provision in a claims-made policy); *Clemente v. Home Ins. Co.*, 791 F. Supp. 118, 121 (E.D. Pa. 1992) (relying on *City of Harrisburg* to conclude that "the *Brakeman* prejudice requirement is inapplicable to claims-made policies," including a prompt-notice provision); *Women's Christian Alliance v. Exec. Risk Indem. Inc.*, No. Civ.A. 02-2594, 2003 WL 21961434, at *5 (E.D. Pa. July 3, 2003) (relying on *City of Harrisburg*, *Pizzini*, and *Borish* to conclude that the notice-prejudice rule does not apply to prompt notice provision contained in claims-made policies); *Ace Am. Ins. Co. v. Underwriters at Lloyds & Co.*, 939 A.2d 935 (Pa. Super. Ct. 2007), *aff'd* 971 A.2d 1121 (Pa. 2009) ("Until such time as the Supreme Court of Pennsylvania rules on this issue, we agree with this reasoning

[the reasoning in *Pizzini*] and decline herein to extend the *Brakeman* rule to claims-made insurance policies.").

Although we are not bound by district court opinions or unpublished opinions from the Third Circuit,[7] *Women's Christian*, *Clemente*, and *4th Street* are highly persuasive authority on this issue.  And when those holdings are considered in conjunction with *Ace* and its affirmance by the Pennsylvania Supreme Court,[8] we feel compelled to find that the Pennsylvania Supreme Court would not extend the notice-prejudice rule to a prompt notice provision in a claims-made policy.  *See Allstate Prop. & Cas. Ins. Co. v. Squires*, 667 F.3d 388, 391 (3d Cir. 2012) (explaining that "decisions of state intermediate appellate courts should be accorded significant weight in the absence of an indication that the highest state court would rule otherwise," and finding Pennsylvania's intermediate appellate court "decisions provide significant guidance for us in answering the question that we address" (quotation marks omitted)); *see also Kantor v. Hiko Energy, LLC*, 100 F. Supp. 3d 421, 427–28 (E.D. Pa. 2015) (explaining that the "rulings of the intermediate appellate courts are accorded significant weight and should not be disregarded

---

[7] "A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Holland v. Holt*, 409 F. App'x 494, 497 (3d Cir. 2010) (quotation marks omitted).  In addition, under the Third Circuit's Internal Operating Procedures, non-published opinions "are not regarded as precedents that bind the court . . . [a] *fortiori*, they are not precedents for the district courts of this circuit."  *In re Grand Jury Investigation*, 445 F.3d 266, 276 (3d Cir. 2006).

[8] The Pennsylvania Supreme Court summarily affirmed the Superior Court's decision in *Ace* and did not discuss its reasoning or write on the issues before it.  *Ace Am. Ins. Co.*, 971 A.2d at 1121.  However, in the petition for allowance of appeal, the Supreme Court acknowledged that there were two issues on appeal, one of which involved the lower court's decision to limit *Brakeman*.  *See Ace Am. Ins. Co. v. Underwriters at Lloyds & Co.*, 957 A.2d 1179, 1180 (Pa. 2008) ("The issues, which have been rephrased for clarity, are . . . [2] Did the Superior Court err in declining to extend this Court's holding in *Brakeman v. Potomac Insurance Co.*, 371 A.2d 193 (Pa. 1977), that in the context of a liability policy, the insurance company will be required to prove that the notice provision was breached and that the breach resulted in prejudice to its position, to the claims-made policy at issue in this case?").

absent a persuasive indication that the highest state court would rule otherwise." (internal

citations omitted)).[9]

### ii.      *Arizona Law*

Like Pennsylvania, Arizona law on this issue is far from decided.  Weisberg argues that

the Arizona Supreme Court has recognized the notice-prejudice rule in this context, citing *Lindus*

*v. Northern Insurance Co. of New York*, 438 P.2d 311, 315 (Ariz. 1968).  However, *Lindus*, like

*Brakeman*, involved an occurrence-based policy, and like *Brakeman*, later state courts in Arizona

have declined to extend its holding to claims-made policies.  *See Sletten v. St. Paul Fire &*

---

[9] Were we the first to review this issue, we would be inclined to agree with Weisberg.  The courts in *City of Harrisburg*, *Pizzini*, and similar cases analyzed whether the notice-prejudice rule applies to a coverage provision in a claims-made policy — which says a claim must be reported to the insurance company during the policy period — and not a prompt notice provision — which requires notice "immediately" or "as soon as practicable."  In that context, their holdings are consistent with the nature of claims-made policies, in that "notice *during the policy period* is the essence of the contract, providing a date certain after which an insurer knows that it is no longer liable under the policy."  *City of Harrisburg*, 596 F. Supp.at 960; *see also, e.g.*, *Westport Ins. Corp.*, 2002 WL 31018554, at *10 ("Since the reporting requirement in a claims-made policy helps define the scope of coverage under the policy, such reporting requirements are strictly construed" and the "notice-prejudice rule does not apply." (quotation marks omitted)); *id.* (explaining that the court strictly construes the reporting requirement to ensure the parties get the benefit of their bargain, specifically "[a]n insurer receives the benefit of a clear and certain cut-off date for coverage, whereas, the insured typically pays a lower premium").

That, however, is not the situation that we have here.  Here, Weisberg complied with the policy's coverage provision and timely submitted the claim within the period set by the ERP Endorsement.  (Doc. No. 70, Oral Ar. Tr. at 5:16–23 (counsel for American Guarantee conceding that Weisberg reported the claim within the extended reporting period).)  The question now is whether American Guarantee can nonetheless deny any duty to defend for failure to comply with the prompt-notice provision without first demonstrating that it was prejudiced by the late notice.  *City of Harrisburg* and *Pizzini* did not address this more nuanced question, and we are not convinced that their reasoning applies with equal force in this situation.  A prompt notice provision, unlike a coverage provision, goes to the time within which the insurer can begin to investigate and pursue settlement — it is meant to limit any potential prejudice to the insurer caused by notice late in the game.  Requiring the insurer to show prejudice in this instance would not undermine the parties' bargain because it would not alter or extend the reporting period for coverage purposes.

The cases that have decided this issue — including *Women's Christian*, *Clemente*, *Ace*, and *4th Street* — rely on *City of Harrisburg* and its progeny without any discussion of their reasoning or any attempt to distinguish the underlying facts.  Although we feel compelled to follow these cases — and in particular, to follow *Ace*, which was affirmed by the Pennsylvania Supreme Court — we note that their holdings give us pause to the extent that they seem divorced from the reasoning outlined by *City of Harrisburg*.

*Marine Ins. Co.*, 780 P.2d 428, 430 (Ariz. Ct. App. 1989) (declining to extend the "late notice/prejudice rule to claims-made policies . . . because the effect would be to convert claims-made policies into occurrence policies"); *Thoracic Cardiovascular Assocs. Ltd. v. St. Paul Fire & Marine Ins. Co.*, 891 P.2d 916, 921 (Ariz. Ct. App. 1994) (finding *Sletten* dispositive to the extent it refused to extend the notice-prejudice rule to claims-made policies).

That said, *Sletten* and *Thoracic Cardiovascular* — like *City of Harrisburg* and similar cases — analyzed only whether the notice-prejudice rule applies when an insured fails to comply with a coverage provision.  Those cases did not analyze whether the notice-prejudice rule would apply to a prompt-notice provision in a claims-made policy, and our research has uncovered no court that has decided this issue as a matter of Arizona law.  However, at least two district courts in Arizona have limited *Sletten* and *Thoracic* to their reasoning.  *See 11333 Inc. v. Certain Underwriters at Lloyd's, London*, No. CV-14-02001-PHX-NVW, 2015 WL 1578501, at *6–7 (D. Ariz. Apr. 9, 2015); *MBP Collection LLC v. Everest Nat'l Ins. Co.*, No. CV-17-04022-PHX-GMS, 2019 WL 110978, at *3 (D. Ariz. Jan. 4, 2019).

In both *11333 Inc.* and *MBP Collection LLC*, the Arizona District Court was faced with what "may best be described as a discovery policy." *11333 Inc.*, 2015 WL 1578501, at *6; *MBP Collection LLC*, 2019 WL 110978, at *3.  Because each policy "define[d] its risk by when the insurer discover[ed] the loss, not by when he report[ed] it," they were neither occurrence-based policies nor claims-made policies. *11333 Inc.*, 2015 WL 1578501, at *6.  In determining whether the notice-prejudice rule applied, the courts discussed *Sletten* and *Thoracic* and noted that unlike those cases, extending the notice-prejudice to the discovery policies before them would not unfairly extend the policy periods or alter the parties' bargain. *Id.* at *7 ("The requirement that Plaintiff provide notice at the earliest practicable moment, and in no event later

20

than sixty days after discovery, does not measure the risk Underwriters assumed in the Insuring Agreements, as reporting requirements in claims-made policies do.").

In *MBP* in particular, the court reasoned that the "essence of a claims-made policy is **notice to the carrier within the policy period**," and "the notice-prejudice rule does not apply, because applying it would be tantamount to an extension of coverage, which would in effect rewrite[ ] the contract between the two parties." *Id.* at *3. For the discovery policy at issue, however, discovery, not notice, triggered coverage under the contract. *Id.* Therefore, "the rationale for not extending the notice-prejudice rule to claims-made policies does not apply in this context." *Id.* ("Unlike claims-made policies, the application of the notice-prejudice rule here would not have the effect of converting the policy to an occurrence policy."). "Instead, [the rule] merely requires that [the insurance company] provide coverage to claims that are discovered and reported within the policy period if it has not been prejudiced by a late notice." *Id.*

Because extending the notice-prejudice rule to prompt notice provisions in claims-made policies would not alter the parties' bargain or extend the reporting period, we predict that the Arizona Supreme Court would find that the notice-prejudice rule applies in this context, so long as the claim is reported during the policy's reporting period as required by the coverage provision.

### iii.    Texas Law

Unlike Arizona and Pennsylvania, Texas law is (thankfully) clear on this issue. In 2009, the Texas Supreme Court held that "in a claims-made policy, when an insured gives notice of claims within the policy period or other specified reporting period, the insurer must show that the insured's noncompliance with the policy's 'as soon as practicable' notice provision prejudiced

the insurer before it may deny coverage." *Prodigy Commc'ns Corp. v. Agricultural Excess & Surplus Ins. Co.*, 288 S.W. 3d 374, 382 (Tex. 2009).

***

Because we find that Texas and Arizona would apply the notice-prejudice rule in this context and Pennsylvania would not, there is an "actual" conflict between the laws of the three states.

### 2.      True Conflict

Because there is an actual conflict, we must next determine whether there is a "true" conflict.  A true conflict exists when the interests of the relevant states would be impaired by the application of the other's laws.  To determine whether there is a true conflict, we look to whether each "state['s] interests are implicated on the facts of this case."  *Hammersmith*, 480 F.3d at 232.

### i.      Pennsylvania's Interest

Beginning with Pennsylvania, we find that Pennsylvania has an interest in having its law applied in this action because the insurance policy was issued in Pennsylvania, by a company licensed to do business in Pennsylvania, to a business located in Pennsylvania.[10]  *See Specialty Surfaces Int'l Inc.*, 609 F.3d at 232.  Weisberg argues that the relevant contract is the ERP Endorsement, not the underlying policy, and that he was an Arizona resident, not a Pennsylvania resident, when the ERP Endorsement went into effect on January 14, 2018.  (Doc. No. 70, Oral Ar. Tr. at 30:4–9.)  We do not agree that the ERP Endorsement is the relevant contract. Although Weisberg reported his claims to American Guarantee during the extended reporting

---

[10] During oral argument, Weisberg's counsel was unable to say whether Weisberg maintained a Pennsylvania business license for his firm.  However, he did concede that if the firm had a business license it would be a Pennsylvania license because Weisberg lived in Pennsylvania and used his home address as the business address.  (*See* Doc. No. 70 at 37:16–39:11 ("If he did have a business license, it would have been in Pennsylvania.").)

period, the substantive issues in this action are governed by the underlying policy.  Even the

prompt notice provision (the source of this lengthy choice of law dispute) is in the primary policy

and not within the ERP Endorsement.  Therefore, when we discuss the "contract," we mean the

Lawyers Professional Liability Insurance Policy, which was issued in Pennsylvania while

Weisberg was a resident of Pennsylvania, addressed to Weisberg's law firm at a Pennsylvania

address,[11] and included Pennsylvania-specific provisions.  (*See* Doc. No. 70, Oral Ar. Tr. at 32:4;

36:21–38:2 (Weisberg's counsel conceding that the policy was issued in Pennsylvania and that

as of January 14, 2017, Weisberg had not yet moved to Arizona and remained a Pennsylvania

resident); Doc. No. 42-3 at p. 5 (listing the law firm's mailing address as Merion Station,

Pennsylvania); *id.* at p. 24 (Pennsylvania Amendatory Endorsement).)

As the Third Circuit found in *Specialty Surfaces*, "Pennsylvania . . . has an interest in

having its law apply to an insurance policy issued in Pennsylvania by a company licensed to do

business in Pennsylvania to two companies that have their principal place of business in

Pennsylvania."  609 F.3d at 232.  In addition, because the underlying actions are pending in

Pennsylvania, we find that Pennsylvania has an interest in how coverage for defense costs and

indemnification are afforded in those actions.  *See Travelers Prop. Cas. Co. of Am. v. Chubb*

*Custom Ins. Co.*, 864 F. Supp. 2d 301, 309 (E.D. Pa. 2012) ("Indiana has an interest in whether

the potential liability in the underlying action is covered because the harm is allegedly caused by

a farm located in Indiana and suffered by Indiana residents and property.").

---

[11] Indeed, in 2016 when Weisberg submitted his application for the policy to American Guarantee, he noted a "NEW ADDRESS" of "512 Prescott Road Merion Station, PA 19066."  (Doc. No. 58-1 at p. 7.)  And he included a copy of his business letterhead, which listed the same Merion Station address.  (*Id.* at p. 8.)

ii.      *Arizona's Interest*

As for Arizona and Texas, we have found that both states would extend the notice-prejudice rule to situations like the one before us to prevent forfeiture of contracts and ensure that insureds do not forfeit that for which they have paid unless the insurance company is prejudiced by late notice.  Beginning with Arizona, we turn now to whether either state's policy is implicated by the facts before us.

We find it noteworthy that the policy was not issued, negotiated, or delivered to Weisberg in Arizona, and neither Zurich nor Weisberg was an Arizona resident at the time the policy issued or for the majority of the time that it was in effect.  *Cf. Hammersmith*, 480 F.3d at 235 ("[W]e believe New York's interest in regulating an insurance contract issued to a New York insured, negotiated by New York brokers, delivered in New York, and entitled 'New York Coverage Plus Umbrella Liability Policy,' is paramount."); *Zurich Am. Ins. Co. v. R.M. Shoemaker Co.*, Civ. A. No. 12-873, 2012 WL 895451, at *3 (E.D. Pa. Mar. 16, 2012) ("Pennsylvania has a strong interest in having its law apply here where the insurance policies were issued in Pennsylvania, with the aid of a Pennsylvania broker, by insurance companies licensed to do business in Pennsylvania, to an insured which is incorporated in and has its principal place of business in Pennsylvania."); *Travelers Prop. Cas. Co. of Am.*, 864 F. Supp. 2d at 309 ("Pennsylvania also has an interest in having its law applied to an insurance policy issued by insurers licensed to do business in Pennsylvania to two Pennsylvania corporations that have their principal places of business in Pennsylvania.").

In addition, none of the underlying claims were filed in Arizona, further suggesting that Arizona does not have an interest in preventing forfeiture under the policy at issue in this case. *Cf. Zurich Am. Ins. Co.*, 2012 WL 895451, at *3 ("New Jersey, in contrast, has an interest in

having its law apply given that the underlying suit was filed by a county of the State of New Jersey and the alleged property damage occurred at a correctional facility within New Jersey."); *Travelers Prop. Cas. Co. of Am.*, 864 F. Supp. 2d at 309 ("Indiana has an interest in whether the potential liability in the Cook Action is covered because the harm is allegedly caused by a farm located in Indiana and suffered by Indiana residents and property.").  In short, the only fact that connects this case to Arizona is the fact that ***after the policy's effective date***, Weisberg moved there and from Arizona, sent notice to American Guarantee of the Pennsylvania actions.  This alone does not give Arizona a true interest in the application of its law to this dispute.

### iii.       Texas's Interest

Similarly, we find that Texas does not have a governmental interest in the application of its law to this case, where neither the insured nor the insurer is a Texas company, the policy is not a Texas policy, and none of the underlying cases are pending in Texas courts.  Weisberg argues that "Texas has an interest" because it "is where Richard's broker resides, where all communications regarding the policy flowed, where all negotiations took place, where Richard paid premiums, and where [American Guarantee] delivered the Policy."  (Doc. No. 61 at p. 7; *see also* Doc. No. 57-1 at p. 3 ¶ 11 (stating that all communications regarding the purchase of the insurance policy and endorsement "were through the Daniels-Head Insurance Agency located in Austin, Texas").)  But the broker did not play as vital a role as Weisberg would have us believe.

It is true that Weisberg's insurance broker is a Texas company and that communications between Weisberg and American Guarantee passed through that broker.  However, that does not mean that communications and negotiations "took place" in Texas, that "Richard paid premiums" in Texas, or that the policy was "delivered" in Texas.  Instead, it appears that communications, payments, and documents passed through Texas on their way from

25

Pennsylvania (where Weisberg resided[12]) to Illinois (where American Guarantee maintains its headquarters) and vice versa. *See Hammersmith*, 480 F.3d at 233 (considering the location of the insured's director, and not the insurance broker, in determining where the insurance contract was delivered).

In addition, we are less inclined to give weight to the location of the broker where, as here, Weisberg's attorney admitted that there were no negotiations related to the policy or the ERP Endorsement, further suggesting the broker served only as a middle man and not as a vital part of the parties' communications.[13] (*See* Doc. No. 70, Oral Ar. Tr. at 52:5–6 ("[L]et's be clear there was never any negotiations at all of this policy . . . .").) Therefore, we find that Texas does not have an interest in applying its law to this case. *Cf. Conn. Indem. Co. v. Carela*, No. 05-CV-1988 (WJM), 2007 WL 2363123, at *5 (D.N.J. Aug. 15, 2007) ("In contrast, New Jersey's only real interest in this matter is somewhat attenuated: a New York resident who parked his truck in New Jersey contacted a New Jersey broker to negotiate an insurance policy with an insurance company in Connecticut. New York's policy of protecting innocent drivers on its roads would be severely weakened if the Court found, based on these contacts, that New Jersey's interest in the matter somehow controlled.").

---

[12] During oral argument, Weisberg's attorney agreed that, until the ERP Endorsement took effect, Weisberg "pa[id] the premiums from . . . Pennsylvania, or wherever he was at the time he needed to write a check." (Doc. No. 70, Oral Ar. Tr. at 41:6–8.)

[13] Our conclusion is necessarily limited to the facts of this case, and the Court offers no opinion on whether Texas would have a greater interest in this lawsuit if the broker were a party or the broker played a more important role in negotiations. And although other cases list the location of the broker in determining whether there is a true conflict, we note that often the broker was located in the same state as either or both the insured and the insurer and none of those cases found a state interest based solely on the location of the broker. *See, e.g.*, *Hammersmith*, 480 F.3d at 235 (both the insured and the broker located in New York); *Zurich Am. Ins. Co.*, 2012 WL 895451, at *3 (insurance company licensed to do business in Pennsylvania; insured maintains a principal place of business in Pennsylvania, and broker located in Pennsylvania).

Because Pennsylvania is the only jurisdiction whose governmental interests would be impaired by the application of the others' laws, there is a "false conflict," and we must apply the law of Pennsylvania, as the only interested jurisdiction.  *See Garcia*, 421 F.3d at 220.

### 3.    *Contacts*

In the alternative, we find that even if there was a true conflict between Pennsylvania law and the law of Arizona or Texas, Pennsylvania has the greatest interest in the application of its laws under the tests outlined by the Second Restatement of Conflict of Laws.  *See Hammersmith*, 480 F.3d at 231 ("Under this final analysis, the court must weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the [particular] issue.")

Beginning with the Second Restatement § 193, we consider the "principal location of the insured risk during the term of the policy."  Here, although Weisberg lived in Pennsylvania, he practiced law in many jurisdictions, including Canada, California, Texas, and the District of Columbia.  Therefore, there is no "principal location" and § 193 does not control.  *See Hammersmith*, 480 F.3d at 233 (finding no "principal location of the insured risk" where the contract provided coverage for subsidiaries operating in more than twenty states and throughout the world).  "Because § 193 is largely inapplicable, we turn to § 188(2)" and consider the following contacts:  "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties."  *Id.*

Beginning with the first factor, we note that an "insurance contract is made in the state where it is delivered."  *Id.*  Although Weisberg does not state where he received the policy, all facts suggest that it was delivered in Pennsylvania.[14]  When Weisberg submitted his renewal

---

[14] In his supplemental declaration, Weisberg discusses the ERP Endorsement and suggests that it was delivered to him in Arizona because he "had the Bala Cynwyd Post Office forward to my Arizona

application to American Guarantee, he noted a "NEW ADDRESS" of "512 Prescott Road

Merion Station, PA 19066."  (Doc. No. 58-1 at p. 7.)  That same address is listed on the policy as

the law firm's "mailing address," and Weisberg included it on his firm letterhead.  (Doc. No. 1 at

p. 30; Doc. No. 58-1 at p. 8.)  In addition, the policy's effective date is January 14, 2017, and

Weisberg admits that he remained a Pennsylvania resident at that time.  (Doc. No. 70, Oral Ar.

Tr. at 36:22–38:2.)  Although the policy passed through Weisberg's Texas broker on its way to

him, that does not mean the policy was "delivered" to Weisberg in Texas.  *See Hammersmith*,

480 F.3d at 233 (considering the location of the insured's director, and not the insurance broker,

in determining where the insurance contract was delivered); *see also* "Deliver" American

Heritage Dictionary (5th ed. 2020) ("To bring or transport to the proper place or recipient;

distribute.").  Weisberg was the policy recipient, not his broker.  Therefore, we find the contract

was "delivered" when it reached Weisberg in Pennsylvania, and the first factor weighs in favor

of Pennsylvania.

　　　　As for the second factor, the place of negotiation, we note that during oral argument

Weisberg's counsel stated that there were no negotiations of this policy.  (*See* Doc. No. 70, Oral

Ar. Tr. at 52:5–6 ("[L]et's be clear there was never any negotiations at all of this policy . . . .").)

However, to the extent there were communications about the policy, it appears they were

between Weisberg in Pennsylvania and American Guarantee in Illinois via Weisberg's broker in

Texas.  Therefore, we find that this factor is either neutral or weighs marginally in favor of

Pennsylvania and Texas.[15]

---

residence any mail sent to [the Merion Station address] during that period of time."  (Doc. No. 57-1 at
p. 4.)  However, as mentioned above, here the relevant contract is the policy, not the ERP Endorsement,
and the policy went into effect in January 2017, when Weisberg remained a Pennsylvania resident.  (Doc.
No. 70, Oral Ar. Tr. at 36:22–38:2.)

　　　　[15] As we mentioned earlier, neither party argues that Illinois law should apply.  Therefore, this
factor is neutral to the extent it points toward Illinois.  *See Travelers Prop. Cas. Co. of Am.*, 864 F. Supp.

Third, the place of performance, is "the state in which notice should have been provided" and "where the premiums are received." *Hammersmith*, 480 F.3d at 234 & n.13.  In this case, Weisberg provided notice and sent payments to American Guarantee in Illinois.  (Doc. No. 57-1 at p. 4 ¶ 20.)  Because this factor points to Illinois, it is neutral on the question before us.  *See Travelers Prop. Cas. Co. of Am.*, 864 F. Supp. 2d at 311 (finding factor neutral where it pointed to Missouri but "no party argues Missouri law should apply").  "The fourth factor, location of the subject matter of the contract, refers to the location of the insured risk." *Hammersmith*, 480 F.3d at 234.  As discussed above, Weisberg practiced law in Canada and throughout the United States.  Because the "insured risk in this case is spread throughout numerous states and countries . . . this factor is [also] neutral." *Id.* at 235.  Finally, as to the parties' domiciles, at the time of contracting, American Guarantee was headquartered in Illinois, Weisberg was a resident of Pennsylvania, and his broker was in Texas.  Although Weisberg is currently an Arizona resident, we are interested in each states' contact *to the contract*.  Therefore, we find that this factor is neutral or weighs in favor of Pennsylvania and Texas.

As to this final factor, the Third Circuit has explained that "the significance of the parties' domiciles 'depends largely upon the issue involved and upon the extent to which they are grouped with other contacts.'" *Hammersmith*, 480 F.3d at 235 (quoting § 188 cmt. e).  In *Hammersmith*, the Court found that "where the issue is late notice . . . it is significant that New York domiciliaries were responsible for providing notice under the terms of the insurance policy which was issued, delivered, and negotiated, at least in part, in New York." *Id.* at 235.  Here, we similarly find it significant that Weisberg, a resident of Pennsylvania at the time the contract was formed, was required to provide notice under a Pennsylvania policy that was issued and

---

2d at 311 (finding factor neutral where it pointed to Missouri but "no party argues Missouri law should apply").

delivered in Pennsylvania.  Weighing these contacts on a qualitative scale, we find that Pennsylvania has a more significant relationship to the insurance policy and this action than Texas or Arizona.

## V.   *Duty to Defend and Indemnify*

Having determined that Pennsylvania law governs this dispute, we now analyze whether under Pennsylvania law, American Guarantee has a duty to defend and indemnify Weisberg in the underlying actions.

### A.   *Legal Standard*

"The interpretation of an insurance contract regarding the existence or non-existence of coverage is generally performed by the court." *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007) (quotation marks omitted).  "Insurance policies are contracts, and the rules of contract interpretation provide that the mutual intention of the parties at the time they formed the contract governs its interpretation." *Penn-Am. Ins. Co. v. Peccadillos, Inc.*, 27 A.3d 259, 264 (Pa. Super. Ct. 2011) (quoting *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 540 (Pa. 2010)). "Our purpose in interpreting insurance contracts is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy," and if the policy language is "clear and unambiguous, we must give effect to that language." *Donegal Mut. Ins. Co.*, 938 A.2d at 290 (quotation marks omitted).

"Generally speaking, under Pennsylvania law, the issuer of a general liability policy has a duty to defend its insured when the allegations in the complaint against it could potentially fall within the coverage of the policy." *Air Prods. & Chems., Inc. v. Hartford Acc. & Indem. Co.*, 25 F.3d 177, 179 (3d Cir. 1994); *see also Am. & Foreign Ins. Co.*, 2 A.3d at 541 ("[I]t is the potential, rather than the certainty, of a claim falling within the insurance policy that triggers the

insurer's duty to defend."). "[T]he allegations raised in the underlying complaint alone fix the insurer's duty to defend." *Penn-Am. Ins. Co.*, 27 A.3d at 265 (quotation marks omitted). And an insurer may refuse to defend a claim against its insured only if "it is clear from an examination of the allegations in the complaint and the language of the policy that the claim does not potentially come within the coverage of the policy." *Id.* (quoting *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 948 A.2d 834, 846 (Pa. Super. Ct. 2008)).

"The question of whether a claim against an insured is potentially covered is answered by comparing the four corners of the insurance contract to the four corners of the complaint." *Am. & Foreign Ins. Co.*, 2 A.3d at 541; *see also Nationwide Mut. Ins. Co. v. Arnold*, 214 A.3d 688, 695 (Pa. Super. Ct. 2019) ("The insurer's obligation to defend is fixed solely by the allegations in the underlying complaint." (quoting *Erie Ins. Exch. v. Muff*, 581 A.2d 919, 925 (Pa. Super. Ct. 2004))). "It is not the actual details of the injury, but the nature of the claim which determines whether the insurer is required to defend." *Nationwide Mut. Ins. Co.*, 214 A.3d at 695 (quotation marks omitted). "[I]f the factual allegations of the complaint on its face comprehend an injury which is actually or potentially within the scope of the policy," the insurer is obligated to defend. *Id.* (quotation marks omitted). In conducting this review, we must take as true the factual allegations of the underlying complaint and liberally construe them in favor of the insured. *Penn-Am. Ins. Co.*, 27 A.3d at 266.

### B.   Analysis

#### 1.   The Testamentary Trust Action

In Count I of the complaint, American Guarantee seeks a declaration that it is under no duty to defend or indemnify Weisberg in the Testamentary Trust Action because Weisberg violated the policy's prompt-notice provision. (Doc. No. 1 at pp. 10–11.) American Guarantee

argues that it is entitled to summary judgment on this claim because the undisputed facts show

that Weisberg  waited eight to nine months before notifying the company of the lawsuit, and

therefore, Weisberg failed to comply with the provision's requirement that the insured

"immediately" provide notice of a claim as a precondition to coverage.  (Doc. No. 44 at pp. 107–

08; Doc. No. 49 at p. 9.)  Weisberg argues that American Guarantee can deny coverage on the

basis of late notice only if it was prejudiced by the delay, and it was not.  (Doc. No. 42-1 at pp.

18–20; Doc. No. 48 at pp. 5–11.)

      For the reasons discussed at length in this opinion, we are compelled to agree with

American Guarantee that Pennsylvania law does not require an insurer to demonstrate prejudice

when the relevant notice provision is contained in a claims-made policy like the one before us.

Therefore, for Weisberg to succeed, he must demonstrate that he complied with the prompt-

notice provision and immediately notified American Guarantee of the Testamentary Trust

Action.  He did not.

      An insurance provision requiring "immediate" notice or notice "as soon as practicable,"

requires that notice be given within a reasonable time under the circumstances.  *See Farmers*

*Nat. Bank of Ephrata v. Emps. Liab. Assur. Corp.*, 199 A.2d 272, 274 (Pa. 1964) (explaining that

insurance provision requiring notice "as soon as practicable" meant notice "within a reasonable

time depending upon the circumstances"); *Immediate-Notice Clause,* Black's Law Dictionary

(10th ed. 2014) ("An insurance-policy provision requiring the insured to notify the insurer as

soon as possible after a claim arises.  A requirement in a policy for 'prompt' or 'immediate'

notice . . . generally means that the notice must be given within a reasonable time under the

circumstances.").  Here, Mildred and James filed their petition to show cause on August 17,

2018.  (Doc. No. 44 at p. 31; *id.* at p. 6 ¶ 15; Doc. No. 48-1 at p. 1 ¶ 1.)  On September 14, 2018,

Weisberg responded to the petition.  (Doc. No. 44 at p. 64; *id.* at p. 11 ¶ 22; Doc. No. 48-1 at p. 2 ¶ 8.)  Eight months later, on May 11, 2019, Weisberg notified American Guarantee about the lawsuit.  (Doc. No. 44 at p. 88; *id.* at p. 11 ¶ 23; Doc. No. 48-1 at p. 2 ¶ 8.)  We cannot find that a delay of more than eight months is reasonable under the circumstances.  *See Farmers Nat. Bank Ephrata*, 199 A.2d at 274 (holding that "[e]ight months without unusual circumstances is not a reasonable time to give notice").

Therefore, American Guarantee's motion for summary judgment is granted as to Count I, and we hold that it has no duty to defend Weisberg in the Testamentary Trust Action, and likewise, has no duty to indemnify Weisberg in that action.[16]  *See Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 673 (3d Cir. 2016) ("Because an insurer's duty to defend its insured in a lawsuit is broader than its duty to indemnify, it necessarily follows that it will not have a duty to indemnify an insured for a judgment in an action for which it was not required to provide a defense.").

### 2.    *Investment Account Counterclaim*

The policy requires American Guarantee to "pay on behalf of an Insured . . . all amounts in excess of the Deductible . . . that an Insured becomes legally obligated to pay as Damages because of a Claim . . . based on an act or omission in the Insured's rendering or failing to render Legal Services for others."  (Doc. No. 42-3 at p. 9.)  In Counts II and III, American Guarantee seeks declarations that it is under no duty to defend or indemnify Weisberg in the Investment Account Counterclaim because the counterclaim is not seeking "Damages" for a claim based on

---

[16] Because we grant declaratory judgment in favor of American Guarantee on the issue of late notice, we do not address American Guarantee's additional argument that it was under no duty to defend or indemnify Richard in the Testamentary Trust Action because Mildred and James sought equitable relief, not damages.  (Doc. No. 44 at p. 109; Doc. No. 49 at p. 11.)

Weisberg's rendition or failure to render "Legal Services" as those terms are defined by the policy.  (Doc. No. 1 at pp. 11–14.)  We agree.

### i.   *"Damages"*

First, the policy defines "Damages" as "the monetary and compensatory portion of any judgment, award or settlement," and the term does not include "[a]ny form of equitable or non-monetary relief," "[p]unitive" damages, or "[p]ersonal profit or advantage to which any Insured was not legally entitled."  (Doc. No. 42-3 at p. 20.)  In the Investment Account Counterclaim, James seeks a declaratory judgment that an agreement between him, Richard, and Mildred is "null, void, and of no effect and/or not an enforceable contract and/or that no repudiation or other breach has occurred and/or the claims made in the Compliant are not ripe for determination." (Doc. No. 42-3 at p. 105.)  This is a request for "equitable or non-monetary relief."

Weisberg argues that the claim nonetheless seeks damages because it includes a request for "all such other relief the Court deems just."  (Doc. No. 42-1 at p. 24; Doc. No. 48 at p. 12.)  We do not agree that this boilerplate language broadened the equity action into one for damages. *See Pa. Cty. Risk Pool v. Northand Ins.*, Civil Action No. 1:07-cv-00898, 2009 WL 506369, at *9 (M.D. Pa. Feb. 27, 2009) ("As to Plaintiffs' assertion that the closing prayer for 'additional or alternative relief' somehow loosed the Anderson Lawsuit from its equitable underpinnings and brought it within the scope of coverage, such language is boilerplate and does nothing to alter the basic nature of the underlying complaint."); *Continental Ins. Co. v. Alperin, Inc.*, No. CIV.A. 97-1008, 1998 WL 212767, at *7 (E.D. Pa. Apr. 27, 1998) ("The DOL complaint's boilerplate request for 'other and further relief' did not give rise to coverage.  The DOL was not seeking 'damages' as defined under Continental's policies.").  Because the Investment Account Counterclaim does not seek "Damages," American Guarantee has no duty to defend or

indemnify Weisberg in that action.  We grant summary judgment in favor of American
Guarantee on Count II.

> ii.     *"Legal Services"*

In the alternative, we find that American Guarantee is under no duty to defend Weisberg
in the Investment Account Counterclaim because the counterclaim did not arise from Weisberg's
rendition or failure to render "Legal Services."

The policy defines "Legal Services" as "professional services performed by an Insured as
a licensed lawyer . . . but only where the act or omission was in the rendition of services
ordinarily performed as a lawyer."  (Doc. No. 42-3 at p. 21.)  In the Investment Account
Counterclaim, James alleges that an agreement between himself and his mother on one side, and
Richard on the other, should be deemed void because it is the result of coercion and was not
given for valid consideration.  Nowhere does James allege that Richard was a lawyer to his
mother and brother or that he was acting in that capacity when he prepared the agreement and
sought their signatures.  To the contrary, the counterclaim states that Richard "is not Mildred's
agent under any Power of Attorney," and the allegations suggest that Weisberg was acting as an
interested party, and not "as a licensed lawyer" when he drafted the purported agreement.  (*Id.* at
p. 102.)  In addition, although James alleges that Richard was "an attorney and partner of
national law firms," those allegations are meant to show that Richard "held the upper hand of
dominance and control" over his mother and brother and that Richard knowingly brought the
Investment Account Action in bad faith and as a means to harass his mother.  (*Id.* at pp. 99, 104.)

Given these allegations, we find that James's counterclaim was not "based on an act or
omission in the Insured's rendering or failing to render Legal Services for others."  *Cf. Niagara
Fire Ins. Co. v. Pepicelli, Watts & Youngs, P.C.*, 821 F.2d 216, 220 (3d Cir. 1987) (finding that

the underlying "negligence and breach of contract allegations concern the failure of the Law

Firm to render competent professional services while collecting fire insurance proceeds," and

therefore, "they constitute 'claims arising out of any act or omission of the insured in rendering

or failing to render professional services for others in the insured's capacity as a lawyer'"

(alterations adopted)).

Weisberg argues that the counterclaim "makes several factual allegations that potentially

fall within coverage, including 'breach of trust as an attorney,' 'breach of attorney-client

confidentiality,' and 'breach of [Weisberg's] fiduciary duties." (Doc. No. 42-1 at p. 24; Doc.

No. 48 at p. 12.) But most of those allegations are included in James's answer, not his

counterclaim. For example, James answers the allegations in Richard's complaint by saying that

"to the extent any of the averments of this paragraph are based on information James confided in

Plaintiff when, allegedly 'Plaintiff counseled the Defendant about his bankruptcy,' the averments

amount to an inexcusable breach of attorney-client confidentiality in a public filing." (*See, e.g.*,

Doc. No. 42-3 at p. 84 (internal citation omitted).) Similarly, James asserts as a defense to

Richard's claims that Richard's "conduct amounts to a breach of trust as an attorney, eldest son,

person, and limited agent." (*Id.* at p. 100.) However, James does not mention these alleged

breaches in his counterclaim or bring any claim against Richard related to his breach of attorney-

client confidentiality or breach of trust as an attorney. Therefore, we cannot find that the

counterclaim is "*based on* an act or omission in the Insured's rendering or failing to render Legal

Services for others."

In addition, although James alleges that Weisberg breached fiduciary duties that he owed

his mother and brothers, there is no allegation that those fiduciary duties arose out of Richard's

role as lawyer. For example, James's allegation that Richard "fraudulently redirect[ed] the funds

to an alternative trust in breach of his fiduciary duties," is a factual allegation related to Richard's role as financial agent for his mother and as co-trustee of the Testamentary Trust.

For those reasons, we also grant summary judgment in favor of American Guarantee as to Count III and find that even if James's counterclaim sought Damages, American Guarantee is under no duty to defend or indemnify Richard in the Investment Account Counterclaim.

### 3.  *Real Estate Partnership Counterclaim*

Counts IV through VIII relate to the Real Estate Partnership Counterclaim.  American Guarantee seeks declarations that it is under no duty to defend the counterclaim because the claim is excluded from coverage under Exclusions D, E, G, T, and U.[17]  In this opinion, we focus on Exclusions D and T, mindful of the fact that the insurer "bears the burden of proving the applicability of the exclusion."  *Nationwide Mut. Ins. Co.*, 214 A.3d at 695 (quoting *Erie Ins. Exchange*, 581 A.2d at 926).

### i.  *Exclusion D*

Exclusion D precludes coverage for any "Claim or Damages . . . arising out of, in whole or in part . . . an Insured's or former Insured's capacity or status as . . . an officer, director, partner, shareholder, manager or employee of a business organization . . . ."  (Doc. No. 42-3 at p. 11.)  Pennsylvania courts interpret the phrase "arising out of" in an insurance contract to mean "causally connected with, not proximately caused by," and "[b]ut-for causation, i.e., a cause and result relationship, is enough to satisfy this provision of the policy."  *Allstate Prop. & Cas. Ins. Co.*, 667 F.3d at 391 (quotation marks omitted).

---

[17] In its briefing, American Guarantee also argues that it is under no duty to defend because Richard failed to provide immediate notice of the Real Estate Partnership Counterclaim and because the counterclaim is not based on the provision of legal services. (Doc. No. 44 at p. 112 n.1; Doc. No. 49 at pp. 10 n.2, 13.)  However, because American Guarantee's complaint does not request declaratory judgment on these grounds, we do not address them here.

The Real Estate Partnership Counterclaim arises out of Weisberg's role as partner in the Holland Property and Walnut Property partnerships.  James alleges that he and Richard entered "two oral partnership agreements," one for each property, and that Richard unilaterally sold both properties and kept all profits in breach of those agreements and his fiduciary duties as a partner to the respective partnerships and his brother.  (Doc. No. 42-3 at pp. 55, 62–65.)  The counterclaims, therefore, "arise[ ] out of, in whole or in part," Richard's capacity as a "partner . . . of a business organization."  *Cf. Regis Ins. Co. v. Kenny's Bar & Restaurant*, Pa. D. & C.5th 6, 14 (Pa. Ct. Comm. Pl. 2008) (granting summary judgment in favor of insurer where the "language of the assault and battery exclusion" — which stated that the company was "under no duty to defend or indemnify against causes of action for personal injury arising 'in whole or in part' from an assault and battery" — "plainly relieves [the company] of its duty to defend or indemnify").

Weisberg argues that the counterclaim "includes numerous factual allegations that do not involve Richard's alleged status as a partner with James," including the allegation that Richard "served as counsel for the partnership."  (Doc. No. 42-1 at pp. 21–22; Doc. No. 48 at pp. 13–14.) But an off-hand factual allegation does not change the nature of the underlying claims, which are based on Weisberg's position as partner and not on his position as counsel.  *See Niagara Fire Ins. Co.*, 821 F.2d at 220 ("The exclusion speaks of excluded claims, and thus the character of the specific legal claims, rather than the malpractice suit's general factual background, must be analyzed to determine the exclusion issue."); *see also Coregis Ins. Co. v. Larocca*, 80 F. Supp. 2d 452, 456–57 (E.D. Pa. 1999) (applying an exclusion that "exempted from coverage claims that arise out of the insured lawyer's activities as an officer or director of a corporation or business" because the underlying allegations "involve overlap between [the lawyer's] role as

legal counsel and as partner/trustee to [the business]"); *cf. Niagara Fire Ins. Co.*, 821 F.2d at 220–21 (analyzing a similar exclusion and explaining that "an attorney may simultaneously act as a lawyer and as an officer or a director of a business, and [the exclusion] is designed to prevent coverage for a claim based upon such actions").

Because Exclusion D applies, we grant summary judgment in favor of American Guarantee on Count IV and hold that the company is under no duty to defend or indemnify Weisberg in the Real Estate Partnership Counterclaim.

### iv.    *Exclusion T*

In the alternative, we find that Exclusion T also precludes coverage under the policy. Exclusion T states that the policy does not apply to any "Claim or Damages arising out of in whole or in part . . . [a]ny actual or alleged acts or omissions by any Insured . . . in connection with any investment in which any Insured has an interest."  (Doc. No. 42-3 at p. 12.)  The counterclaim is based on Richard's allegedly wrongful acts in connection with the Holland Property and the Walnut Property — two investments in which he, as partner, had an interest. (*See* Doc. No. 42-3 at pp. 63–64 (explaining the terms of the partnership agreement, including that Richard and James "shared equal rights and an equal voice," that profits would be split 50-50, and that the Walnut Property and Holland Property were assets of the respective partnerships).)  Therefore, coverage is also excluded under Exclusion T.

Weisberg argues that the counterclaim is not based solely on acts related to an investment, but also includes "allegations of breach of attorney-client confidentiality unrelated to any real estate venture and breach of duties while acting as 'counsel for the partnership.'"  As mentioned, we find this argument unpersuasive.  The claims in the Real Estate Partnership Counterclaim are also excluded from coverage under Exclusion T.  Therefore, we grant summary

judgment in favor of American Guarantee on Count VII and hold that it is under no duty to defend or indemnify Weisberg in the Real Estate Partnership Counterclaim.

Because we find that Exclusion D, and in the alternative, Exclusion T, preclude coverage, we need not address American Guarantee's additional arguments that coverage is precluded by Exclusions E, G, and U, and we dismiss as moot Counts V, VI, and VIII.

### 4.    The Cricket Property Action

That brings us to the final lawsuit, the Cricket Property Action.  In Counts IX through XI, American Guarantee seeks a declaration that is has no duty to defend or indemnify Weisberg in the Cricket Property Action because the underlying claims are not based on the rendition or failure to render "Legal Services," and even if they were, coverage would be excluded under Exclusions G and U.

### i.    "Legal Services"

American Guarantee argues that the Cricket Property Action does not trigger coverage because none of the underlying claims are based on an act or omission in the rendering or failure to render "Legal Services."  (Doc. No. 49 at p. 21; 44 at p. 121; 51 at p. 11.)  We agree.  The Cricket Property Action alleges that Richard breached an agreement with his parents when he placed the Cricket Property for sale, forcing his mother to purchase the property a second time and keeping the initial payments that she gave him.  The action also alleges that Richard has wrongfully refused to pay back a loan from him mother for the Derwen Property.  However, there is no allegation that Richard was acting as an attorney for his parents (both of whom were also licensed attorneys) or otherwise gave them legal advice when they entered the Cricket agreement, or when Richard received the personal loan from Mildred.

Richard argues that the underlying complaint alleges that "Richard is an attorney" and that he "served as attorney-in-fact" and as an agent "for his mother, Mildred, and father, Morris." (Doc. No. 42-1 at p. 25; Doc. No. 48 at p. 15.)  But as mentioned, it is not enough that the complaint merely alleges that "Richard is an attorney."  Richard can be an attorney and not have been acting in that capacity when the allegedly wrongful conduct took place.  And although Richard was serving as "attorney-in-fact" and as an "agent" for his parents when he purchased and owned the Cricket Property, that does not mean he was rendering legal services.  One can be an "agent," serve as "attorney-in-fact," and act under a "power of attorney" without being a lawyer or rendering legal services.  *See* 20 Pa. Stat. & Cons. Stat. § 5601.4 (explaining the scope of authority of an agent acting under a power of attorney).  Therefore, we do not find these terms to be dispositive.

Because the Cricket Property Action is not based on the rendition of Legal Services, American Guarantee is under no duty to defend or indemnify Weisberg in that lawsuit, and we grant summary judgment in favor of American Guarantee on Count IX.

### ii.    *Exclusion G*

In the alternative, we find that even if the complaint was based on the rendition of Legal Services, coverage is excluded under Exclusion G because the claims are "based upon or aris[e] out of, in whole or in part, any liability of any Insured resulting from any oral or written contract."  As mentioned, the term "arising out of" means "causally connected with, not proximately caused by," and "[b]ut-for causation, i.e., a cause and result relationship, is enough to satisfy this provision of the policy."  *Allstate Prop. & Cas. Ins. Co.*, 667 F.3d at 391 (quotation marks omitted); *see also Fed. Ins. Co. v. KDW Restructuring & Liquidation Servs., LLC*, 889 F. Supp. 2d 694, 702–03 (M.D. Pa. 2012) (analyzing a similar exclusion provision and

"conduct[ing] a 'but for' analysis").  Under this "but for" analysis, we must analyze the

complaint in the Cricket Property Action under the "gist of the action" doctrine.  *See Fed. Ins.

Co.*, 889 F. Supp. 2d at 703; *see also Continental Casualty Co. v. County of Chester*, 244 F.

Supp. 2d 403, 409 (E.D. Pa. 2003) ("[W]hether the 'arising out of a breach of contract' exclusion

applies turns on whether the cause of action is characterized as sounding in contract or in tort.").

　　"[T]o be construed as a tort action, the wrong ascribed to the defendant must be the gist

of the action with the contract being collateral."  *Phico Ins. Co. v. Presbyterian Med. Servs.

Corp.*, 663 A.2d 753, 757 (Pa. Super. Ct. 1995); *see also Earl v. NVR, Inc.*, __ F.3d __, 2021 WL

833990, at *4 (3d Cir. March 5, 2021) ("The gist of the action doctrine provides that 'an alleged

tort claim against a party to a contract, based on the party's actions undertaken in the course of

carrying out a contractual agreements is barred when the gist or gravamen of the cause of action

stated in the complaint, although sounding in tort, is, in actuality a claim against the party for

breach of its contractual allegations.'" (quoting *Dixon v. N.W. Mut.*, 146 A.3d 780, 788 (Pa.

Super. Ct. 2016))).  "[T]he important difference between contract and tort actions is that the

latter lie from breach of duties imposed as a matter of social policy while the former lie for the

breach of duties imposed by mutual consensus."  *Phico Ins. Co.*, 663 A.2d at 757.

　　Here, Richard argues that although the Cricket Property Action is based in part on his

alleged agreements with his parents, there are multiple claims "that do not rely on contract for

recovery" — notably, Mildred's claims for conversion, money had and received, and breach of

fiduciary duty.  (Doc. No. 42-1 at p. 25; Doc. No. 48 at p. 16.)  We cannot find that the parties'

contracts are collateral to these tort claims, which "arise from the same essential facts and

circumstances as those which underlie the breach of contract claims."  *Fed. Ins. Co.*, 889 F.

Supp. 2d at 707–08.  Specifically, Mildred's claims for conversion, money had and received, and

breach of fiduciary duty — like her claim for breach of contract — are based on Richard's agreement to act as his parents' agent and purchase and hold title to the Cricket Property on their behalf.  But for this agreement, Richard would have had no duty to purchase and hold the Cricket Property for their benefit, and therefore, his decision to keep his parents' initial payments and to unilaterally sell the Cricket Property would not have amounted to conversion, money had and received, or breach of fiduciary duty.  (*See* Doc. No. 42-4 at pp. 17–20.)  *See Redev. Auth. of Cambria Cty. v. Int'l Ins. Co.*, 685 A.2d 581, 589 (Pa. Super. Ct. 1996) ("While Barr Township and the MCWA have employed negligence concepts in drafting their complaint, it cannot be disputed that their claims arise out of and are based upon duties imposed upon the Authority solely as a result of the contract between the Authority and Barr Township through the MWCA.").

Because the claims in the Cricket Property Action arise out of "an oral or written contract" they are excluded from coverage under Exclusion G, and American Guarantee is under no duty to defend or indemnify Weisberg in that action.  We grant summary judgment in favor of American Guarantee on Count X.  Because we find that American Guarantee is under no duty to defend or indemnify the Cricket Property Action under Counts IX and X, we need not determine whether Exclusion U would also preclude coverage and dismiss Count XI as moot.[18]

## VI.    *Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing*

That leaves only Weisberg's counterclaims for breach of contract and breach of the duty of good faith and fair dealing (i.e., bad faith).  However, because American Guarantee had a reasonable basis for denying coverage under the policy, we grant summary judgment in favor of

---

[18] Because we find that American Guarantee is under no duty to defend Weisberg in any of the underlying actions, we need not address Richard's contention that the underlying cases involve related wrongful acts, such that if one claim is potentially covered, American Guarantee must defend all of the claims in all of the actions.

American Guarantee on these claims as well.  *See Phila. Indem. Ins. Co. v. Fed. Ins. Co.*, No. Civ.A. 02-CV-7247, 2004 WL 1170525, at *9 (E.D. Pa. May 26, 2004) (granting motion for summary judgment on bad faith claim in favor of insurer because it "reasonably believed that [the insured] had forfeited coverage under the Policy by failing to timely comply with the notice provision," and "[t]hus, the [insurance company's] actions cannot be the basis for a bad faith claim").

### VII.    *Conclusion*

In sum, we find that Pennsylvania law governs and that American Guarantee does not have a duty to defend or indemnify Weisberg in any of the underlying actions.  American Guarantee's motion for summary judgment is granted as to Counts I, II, III, IV, VII, IX, and X, and as to Weisberg's counterclaims.  The motion is denied as moot for Counts V, VI, VIII, and XI.  Weisberg's motion to summary judgment is denied in its entirety.

An appropriate order follows.